FILED
MAR 2 1 2019
Clerk U.S. District Court
Greensboro, NC
BY

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| LORI D. McLAUGHLIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 19CV318 |
| | ) |
| WILLIAM P. BARR | ) |
| In His Official Capacity as United States | ) |
| Attorney General, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**COMPLAINT**

**(UNLAWFUL DISCRIMINATION IN FEDERAL EMPLOYMENT BASED UPON RACE (AFRICAN AMERICN), SEX (FEMALE), UNLAWFUL RETALIATION FOR PRIOR PROTECTED EEO ACTIVITIES, AND HARASSMENT (HOSTILE WORK ENVIRONMENT)**

COMES NOW the Plaintiff in this matter, Lori D. McLaughlin, to bring this Federal District Court lawsuit against the aforenamed Defendant, and in furtherance hereof states as follows:

**I. JURISDICTION**

1. Jurisdiction is vested in this Court pursuant to, *inter alia*, Section 717 of Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C.A. Section 2000(e), *et seq.*; the Civil Rights Act of 1991, as amended, codified at 42 U.S.C.A. Section 1981, *et seq.*; Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C.A. Section 791, the Civil Rights Attorney's Award Act, as amended, codified at 42 U.S.C.A. Section 1988, *et seq.*; and Title 29, Code of Federal Regulations, Part 1614, *et seq.*, in that Plaintiff Lori D. McLaughlin was unlawfully discriminated against in the

course of her employment with the United States Government Department of Justice ("DOJ"), Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), on the basis of her race (African American), sex (female) and was further subjected to unlawful retaliation in employment for engaging in protected EEO activities, as set forth herein. Plaintiff Lori D. McLaughlin was also unlawfully harassed constituting a hostile work environment.

## II. VENUE

2. Venue is proper before this Court because the primary actions complained of either occurred within or were directed within the geographical boundaries of the Middle District of North Carolina; and pursuant to 28 U.S.C. Section 1391(e).

## III. PARTIES

3. Plaintiff Lori D. McLaughlin is an African-American female currently domiciled in Whitsett, North Carolina, and who for all times relevant herein was employed on a full-time basis as an employee of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), an agency under the United States Department of Justice ("DOJ"). At all times relevant to this lawsuit, Plaintiff McLaughlin was assigned for her professional work to the Charlotte Field Division of ATF.

4. Defendant William P. Barr is the Attorney General of the United States and, as such, is the Defendant only in his official capacity as Attorney General. Mr. Barr is the senior Executive Branch federal official responsible for the actions of the United States Department of Justice and its subordinate agency, the Bureau of Alcohol, Tobacco, Firearms and Explosives. ATF, which is the principal subject of the allegations made

2

herein, has its current Headquarters located at 99 New York Avenue, N. E., Washington, D. C. 20226.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

5. The bases of this case are Plaintiff's ongoing claims of unlawful discrimination based upon race (African American), sex (female) and unlawful reprisal for prior protected EEO activity, as further stated hereinbelow. Plaintiff Lori D. McLaughlin was also unlawfully harassed constituting a hostile work environment. During the periods of time alleged in the course of this Complaint, Plaintiff McLaughlin was employed as a Special Agent, Grade GS-1811-13, with ATF, located in the Fayetteville Field Office and the Greensboro Field Office of the Agency, under the Charlotte Field Division.

6. On or about July 28, 2014, Plaintiff McLaughlin contacted EEO Counselor John Herring with respect to claims of unlawful discrimination based upon sex, unlawful retaliation for protected activities and unlawfully harassment constituting a hostile work environment. Plaintiff McLaughlin had previously sought EEO Counseling from Mr. Herring regarding the same issues. On both occasions, Mr. Herring failed to provide Plaintiff McLaughlin with fair and impartial EEO Counseling in accordance with EEOC Management Directive 110 (MD-110). Specifically, Mr. Herring failed and later refused to provide EEO counseling regarding numerous issues submitted by Plaintiff McLaughlin. Mr. Herring also failed to attach numerous supporting documents to his official EEO Counseling Report in accordance with MD-110. For instance, Plaintiff McLaughlin provided concrete evidence that her immediate supervisor made a false statement to Mr. Herring and Mr. Herring intentionally and maliciously did not include the Plaintiff statements or the documents regarding the incident in his official EEO

3

Counseling Report. In addition, Mr. Herring attempted to intimidate a female witness into not cooperating by requesting her to sign a written statement during the EEO Counseling process, which is clearly not a requirement under MD-110. Mr. Herring fully expected the female witness to refuse to provide a written statement in fear of retaliation by ATF management officials. When his tactic was unsuccessful, Mr. Herring failed to attach the "requested" witness statement to his official EEO Counseling Report because the witness statement fully supported the allegations made by Plaintiff McLaughlin. Mr. Herring also made every attempt to "cover-up" the sexual misconduct allegations mentioned inside this witness statement. Most importantly, Mr. Herring falsified the "Final Interview Notice" claiming to have spoken telephonically with Plaintiff McLaughlin in order to terminate the EEO Counseling process at the direction of Robynn Ferguson-Russ, Deputy Chief of EEO.

7. On October 22, 2014, Plaintiff McLaughlin filed a formal EEO Complaint, specifically alleging, *inter alia*, unlawful discrimination and unlawful harassment constituting a Hostile Work Environment during her employment in the ATF Charlotte Field Division. Many issues of ongoing discrimination based upon sex and maintenance of a hostile work environment were raised by Plaintiff in the course of her EEO counseling. The Complaint was docketed as Agency Case No. ATF-2014-00881. During the "Acceptance" stage of this complaint, Robynn Ferguson-Russ (Deputy Chief of EEO) intentionally and maliciously dismissed all allegations from the complaint for which the "female witness" could be used to testify in support of Plaintiff McLaughlin. Most importantly, Ms. Ferguson-Russ dismissed these issues without providing a rationale for their dismissal in direct violation of MD-110.

Case 1:19-cv-00318-CCE-JEP    Document 1    Filed 03/21/19    Page 4 of 62

8. An EEO investigation subsequently was conducted by the Agency, with a Report of Investigation (ROI) being completed and provided to the Plaintiff and the Agency. Upon reviewing the official Report of Investigation (ROI), Plaintiff McLaughlin realized that ATF had falsified two (2) emails that were contained inside the ROI. Specifically, ATF changed the dates on emails to "cover-up" the interview of a management witness (ATF Taskforce Officer) that was clearly conducted after the EEO Office had terminated the EEO investigation. In addition, the former Chief of EEO/DOJ attorney (Patricia R. Cangemi) had repeatedly denied Plaintiff's request for an extension of the EEO investigation. Even though, MD-110 allowed Ms. Cangemi to authorize the extension of the EEO investigation. Nevertheless, Plaintiff McLaughlin received a "recorded" audio voice message left by the EEO investigator stating that the EEO office had instructed him to shut the investigation down on the weekend of October 2, 2015. At the direction of Robynn Ferguson-Russ (Deputy Chief of EEO), the EEO investigation was terminated on October 2, 2015. However, the deadline to conduct the EEO investigation was not until October 22, 2015. Ms. Ferguson-Russ intentionally and maliciously terminated the EEO investigation, after Plaintiff McLaughlin provided the EEO investigator with concrete evidence that ATF management officials had violated DOJ/ATF policy in connection with her complaint. Coincidentally, Plaintiff McLaughlin forwarded this evidence on the same date the EEO investigation was terminated by Ms. Ferguson-Russ on October 2, 2015. As a result, the former Chief of EEO/DOJ attorney (Patricia R. Cangemi) allowed the EEO investigator less than two (2) weeks to investigate the associated issues that were recently accepted by Ms. Cangemi on September 25, 2015. Subsequently, Ms. Ferguson-Russ removed this evidence

5

(DOJ/ATF policies) and other evidence from the official Report of Investigation that was submitted by the EEO investigator. The above unethical violations and other violations were reported directly to Snider Page, Chief of EEO without any action or official misconduct investigation. Amazingly, Mr. Page stated that he reviewed Plaintiff's concerns and her EEO complaints were being processed in accordance with EEO regulations. However, Mr. Page never provided an explanation for the falsification of the emails and the termination of the EEO investigation. As a former EEO specialist, Plaintiff McLaughlin has a working knowledge of MD-110 and strongly disagreed with Mr. Page's assessment.

9. On or about December 16, 2015, Plaintiff McLaughlin requested from the Department of Justice the issuance of a Final Agency Decision ("FAD") regarding the complaint. Based on past experience, Plaintiff McLaughlin had lost all faith in the Equal Employment Opportunity Commission (EEOC) and saw no reason to request another EEOC Hearing. In fact, Plaintiff McLaughlin filed a formal "whistleblowing" complaint with the EEOC, Raleigh Area Office regarding the above unethical violations by the agency's EEO Office. This complaint was filed on December 11, 2015 without any timely response from the EEOC, Raleigh Area Office. Subsequently, Plaintiff McLaughlin's "whistleblowing" complaint was forwarded to the EEOC, Office of Federal Operations in Washington, DC without any actions taken by Carlton Hadden (Director). Prior to filing the "whistleblowing" complaint with the EEOC, Plaintiff McLaughlin reported the unethical violations directly to the Department of Justice for an internal resolution on November 23, 2015. However, Richard Toscano (Director of JMD) refused to take any action and simply referred Plaintiff McLaughlin back to ATF.

6

Case 1:19-cv-00318-CCE-JEP    Document 1    Filed 03/21/19    Page 6 of 62

In fact, Mr. Toscano stated "the JMD EEOS does not have oversight authority of the ATF EEO Complaints Process". In contradiction, DOJ policy (H.R. Order DOJ 1200.1, Part 4. Equal Employment Opportunity) states that the Department of Justice, Director of EEO is responsible "for intervening, when necessary, in the processing of bureau discrimination complaints and for guiding EEO programs throughout the Department".

10. On or about September 16, 2016, DOJ issued its Final Agency Decision stating that "the record of investigation does not contain evidentiary support for complainant's claim that she was discriminated or retaliated against, and her claim is therefore denied". On October 21, 2016, Plaintiff McLaughlin filed a timely appeal with the EEOC, Office of Federal Operations. In response, the DOJ/ATF attorneys (Joshua L. Henline) continued their malicious "delay" tactics in order to further deny Plaintiff McLaughlin her "due process" rights. Mr. Henline sought to dismiss the complaint from processing with the EEOC to further harass Plaintiff McLaughlin, as Plaintiff McLaughlin was without legal representation. Specifically, Mr. Henline filed a Motion to Dismiss without ever reviewing the necessary documentation regarding the certified mail receipts associated with the complaint. Nevertheless, the EEOC finally issued its decision on May 9, 2017, denying all of Plaintiff's EEO claims. Essentially, the EEOC denied Plaintiff McLaughlin her rights to a Final Agency Decision and issued their decision without holding DOJ accountable for providing an official response to the unethical violations associated with the complaint. The EEOC decision was forwarded by mail to Plaintiff McLaughlin on May 9, 2017, which presumes a five-day receipt period following the mailing of the document.

7

11. However, Plaintiff McLaughlin actually received the EEOC decision on May 19, 2017. In fact, Plaintiff McLaughlin was out-of-town when the final decision was mailed to her primary residence in Whitsett, North Carolina. Specifically, Plaintiff McLaughlin was preparing her secondary residence for a real estate closing and packing her household goods in connection with a "Government" PCS relocation from Fayetteville to Greensboro, North Carolina during the week of May 9, 2017. In addition, Plaintiff McLaughlin had a death in her family on May 9, 2017. Furthermore, Plaintiff McLaughlin also received medical services (May 13, 2017) from a local hospital in Lillington, North Carolina which is located near her secondary residence in Spring Lake, North Carolina. On May 19, 2017, the moving company removed the last of the household goods from the secondary residence and Plaintiff McLaughlin returned back home to her primary residence in Whitsett, North Carolina. Therefore, the United States District Court Complaint in this matter was timely filed within ninety (90) days of receipt by Plaintiff McLaughlin of the EEOC decision.

12. On or about May 23, 2016, Plaintiff McLaughlin again contacted the Bureau's EEO Office regarding the continuing acts of discrimination and retaliation being conducted against her by ATF management officials. Specifically, Plaintiff McLaughlin contacted Snider Page, Chief of EEO and requested the appointment of an EEO counselor outside her geographical area. Based on previous unethical violations, Plaintiff McLaughlin refused to accept EEO counseling from her local EEO Counselor (John Herring). On May 25, 2016, Robynn Ferguson-Russ, Deputy Chief of EEO assigned John Herring as Plaintiff's EEO Counselor. On May 25, 2016, Plaintiff McLaughlin emailed Richard Toscano, Director of DOJ/JMD and requested the

appointment of an EEO Counselor from his office or another DOJ component/bureau with negative results. Plaintiff McLaughlin also emailed the EEOC, Office of Federal Operations regarding the matter. Subsequently, the EEO Office removed John Herring and appointed Donna Vaughan, EEO Counselor/EEO Complaints Manager in New York, New York.

13. On or about June 7, 2016, Plaintiff McLaughlin was contacted by Donna Vaughan, EEO Counselor regarding the new complaint. Plaintiff McLaughlin notified Ms. Vaughan about the problems/unethical violations associated with the previous EEO counseling session. Nevertheless, Ms. Vaughan also failed to provide Plaintiff McLaughlin with fair and impartial EEO Counseling in accordance with EEOC Management Directive 110 (MD-110). Specifically, Ms. Vaughan failed and later refused to provide EEO counseling regarding numerous issues submitted by Plaintiff McLaughlin. Ms. Vaughan failed to even attempt a resolution of the complaint, as Ms. Vaughan repeatedly refused to contact key management officials regarding the issues in the complaint. Again, Ms. Vaughan also failed to attach numerous supporting documents to her official EEO Counseling Report in accordance with MD-110. Most importantly, Ms. Vaughan falsified the "Final Interview Notice" claiming to have spoken telephonically with Plaintiff McLaughlin in order to terminate the EEO Counseling process at the direction of Robynn Ferguson-Russ, Deputy Chief of EEO. Based on previous experience, Plaintiff McLaughlin secured her telephone toll records to prove the falsification of the form by Ms. Vaughan. Later, Ms. Vaughan admitted to the falsification of the "Final Interview Notice" and further documented in the EEO

Counseling Report that she never gave Plaintiff McLaughlin a final interview on July 28, 2017.

14. On or about August 26, 2016, Plaintiff McLaughlin filed an additional formal EEO complaint with ATF alleging discrimination based upon race (African-American), sex (female) and reprisal for prior protected EEO activities when she was the subject of two (2) internal affairs misconduct investigations. However, Plaintiff McLaughlin requested the immediate removal of her complaint from the ATF by the EEOC, Office of Federal Operations on August 26, 2016. Given that the EEO Office repeated the same unethical conduct in the EEO counseling stage in this complaint, Plaintiff McLaughlin made her written request to Carlton Hadden, Director (OFO) with negative results. Later, this complaint was docketed by ATF as ATF-2016-0080, and formally acknowledged by ATF on October 13, 2016. During the "Acceptance" stage of this complaint, Robynn Ferguson-Russ (Deputy Chief of EEO) intentionally and maliciously dismissed all allegations from the complaint regarding a "Three (3) Day Suspension. Ms. Ferguson-Russ dismissed this issue because an DOJ/ATF attorney (Katherine Meng) was responsible for the misconduct investigation being filed against Plaintiff McLaughlin. Most importantly, Ms. Meng initiated the misconduct investigation while Plaintiff McLaughlin was responding to a "Motion for Summary Judgment" in another Federal Civil Action in the Middle District of Florida (Civil Action No. 11-1168-RWR). In fact, Ms. Meng was the same attorney litigating the aforementioned case for the agency. Coincidentally, this was the second time that Plaintiff McLaughlin came under investigation for misconduct violations while responding to the agency's "Motion for Summary Judgment" in a Federal Civil Action (District of Columbia, Civil Action No.

10

08-cv-01256-RMC). Again, Katherine Meng was the DOJ/ATF attorney litigating the case for the agency.

15. An EEO investigation subsequently was conducted by the Agency, with a Report of Investigation (ROI) being completed and provided to the Plaintiff on March 5, 2017. According to the agency, the ROI was completed on December 13, 2016 and submitted to the agency on January 27, 2017. However, Ms. Ferguson-Russ informed Plaintiff McLaughlin that the ROI would be forwarded to Plaintiff McLaughlin "by the end of February 2017". The agency intentionally and maliciously continued to delay issuing the ROI to Plaintiff McLaughlin. In fact, the agency failed to write an address on the package containing the ROI and the package was mailed back to the agency. Upon reviewing the ROI, Plaintiff McLaughlin realized that the EEO investigator had failed to interview a single ATF management official associated with the "retaliatory" misconduct investigations. Prior to the EEO investigation, Ms. Ferguson-Russ refused to provide a copy of the "IA report" to the EEO investigator in order to facilitate a "fair and impartial" EEO investigation. Furthermore, Ms. Ferguson-Russ refused to allow Plaintiff McLaughlin to review the ROI, stating in her email correspondence that "Agencies are only encouraged to allow complainants to review investigative files and identify deficiencies prior to forwarding the case file to the EEOC for a hearing or issuing a FAD". Lastly, Snider Page, Chief of EEO refused to include comparative data in the ROI after the written request of Plaintiff McLaughlin and in accordance with MD-110. Even though, Eugenio Marquez (Bureau's Deciding Official) admitted to using "comparative data" in order to sustain the "Five (5) Day Suspension" for "Conduct Unbecoming a Government Employee" (engaged in verbal altercations with 2 civilians from commercial

11

companies) against Plaintiff McLaughlin. Conversely, another employee received a "Reprimand" for "Conduct Unbecoming a Federal Employee" (involved in an off-duty altercation with their ex-spouse and acted in a disorderly manner with law enforcement) during the same fiscal year. Another supervisory employee received a "Reprimand" for "Inappropriate Behavior" (engaged in verbal confrontation with a co-worker on several occasions on and off-duty and used inappropriate language and engaged in unsuitable behavior) during the same fiscal year. Mr. Page (Chief of EEO) clearly refused to include the "comparative data" because the data did not support the agency's case.

16. Because EEO Complaint No. ATF-2016-0080 has been pending for more than 180 days, the matters complained of which are contained in this ATF administrative EEO docket are timely and ripe for inclusion in the U.S. District Court case. In addition, Plaintiff McLaughlin did not receive the "updated" Notice of Rights to File from the EEO Office. However, Plaintiff McLaughlin was told via email (Robynn Ferguson-Russ, March 17, 2017) that her timeline would re-start upon the receipt of an outstanding witness declaration. Plaintiff McLaughlin received the witness declaration on June 1, 2017.

## V.  DISMISSAL BY U.S. DISTRICT COURT

17. The Plaintiff is refiling this complaint, as the previous complaint was dismissed without prejudice by the U.S. District Court, Middle District of North Carolina, Court Docket # 1:17-CV-759 on March 21, 2018.

18. The complaint was dismissed for failure to obtain proper service on the Defendant.

12

## VI. BACKGROUND

19. Plaintiff McLaughlin entered employment with ATF in 1989, and served as Special Agent in Grade GS-1811-13 with the Charlotte Field Division since November 2012.

20. Beginning November 2012, Plaintiff McLaughlin's first-level supervisor was Darren Hampton, Resident Agent in Charge (RAC) of the Fayetteville Field Office. Plaintiff's second-level supervisor since May 2013 was Debbie Bullock, Assistant Special Agent in Charge (ASAC), Charlotte Field Division.

21. On or about October 10, 2012, SAC Wayne Dixie denied S/A McLaughlin's request to extend the reporting date for a "voluntary" transfer to the Fayetteville Field Office. ATF management officials have never denied the first request made by any special agent to delay the reporting date for legitimate reasons. S/A McLaughlin had previously spoken with RAC Darren Hampton and he verbally approved the extension until after the holiday season. Later, RAC Hampton advised S/A McLaughlin that she needed to submit a written request to SAC Dixie. However, RAC Hampton stated that he couldn't imagine the Charlotte Field Division denying the request for the extension. S/A McLaughlin was funding the PCS move from personal funds with no expense to the Federal government. SAC Dixie rescinded RAC Hampton's approval and denied the request because of "manpower" issues. Yet, RAC Hampton directed S/A McLaughlin to take annual leave (Use or Lose) when S/A McLaughlin reported to the Fayetteville Field Office on November 18, 2012.

22. On or about November 18, 2012, RAC Darren Hampton assigned S/A Lori

North Carolina and the other three (3) "male" special agents were assigned the remaining six (6) counties in the Eastern District of North Carolina. Prior to my arrival, another special agent (White/Female) was also assigned all seven (7) counties in the Middle District of North Carolina.

23. On or about December 5, 2012, S/A McLaughlin repeatedly requested the secretary to verify that S/A McLaughlin's transfer paperwork was processed by the Charlotte Field Division. The secretary refused to assist S/A McLaughlin with the matter. As a result, S/A McLaughlin's salary was incorrect on the paycheck and S/A McLaughlin was not paying any state taxes to North Carolina. Later, S/A McLaughlin requested assistance from the Charlotte Field Division with negative results. Finally, S/A McLaughlin contacted the Personnel Division and learned that her transfer paperwork had not been processed by the agency.

24. On or about December 26, 2012, RAC Darren Hampton assigned S/A McLaughlin a case referral from another "male" special agent's assigned county (Johnson, Eastern District of North Carolina) which was not consistent with the office policy. According to the office policy, special agents investigated all cases/referrals from their assigned counties. In accordance with that policy, S/A McLaughlin received all cases/referrals from the Middle District of North Carolina. In fact, RAC Hampton, special agents and TFOs forwarded referrals to S/A Lori McLaughlin.

25. On or about January 11, 2013, RAC Darren Hampton advised S/A McLaughlin to report her investigative cases from the Middle District of North Carolina to the ATF Taskforce Officer (Moore County), when S/A McLaughlin was the "ATF" special agent. S/A McLaughlin received a case referral (Chatham County) from the U.S.

14

Attorney's Office and later learned that the TFO was investigating the same case. Therefore, S/A McLaughlin wanted the taskforce officers in her counties to advise S/A McLaughlin when they were investigating cases outside of their respective county. Instead, RAC Hampton verbally instructed S/A McLaughlin (ATF special agent) to report her Federal investigations to the "TFO" (local law enforcement officer).

26. On or about February 11, 2013, RAC Darren Hampton advised S/A McLaughlin that he did not want TFO's in the Middle District of North Carolina to work NICS cases. RAC Hampton was requiring S/A McLaughlin to investigate all NICS cases from all seven (7) counties in the Middle District of North Carolina, when RAC Hampton did not require "male" special agents to investigate all NICS cases in each of their two (2) counties in the Eastern District of North Carolina.

27. On or about February 13, 2013, RAC Darren Hampton assigned S/A McLaughlin a case referral from the ATF Violent Crime Taskforce (Cumberland County, Eastern District of North Carolina), which consisted of three (3) full-time LEO's and at least three (3) part-time LEO's assigned to Cumberland County. The "male" special agents did not agree with RAC Hampton assigning S/A McLaughlin cases/referrals from their counties, because they knew that RAC Hampton was violating the office policy. In this instance, the assigned special agent advised S/A McLaughlin that his "taskforce" would handle the referral in accordance with office policy.

28. On or about March 19, 2013, RAC Darren Hampton assigned S/A McLaughlin a case referral from another special agent's assigned county (Johnson, Eastern District of North Carolina) which was not consistent with the office policy. RAC

15

Hampton again violated the office policy, as RAC Hampton did not assign "male" special agents any cases/referrals from the Middle District of North Carolina.

29. On or about April 8, 2013, RAC Darren Hampton falsely advised S/A McLaughlin that the operation sponsored by the ATF Violent Crime Taskforce would be a "team" effort with all ATF special agents, when RAC Hampton did not force any "male" ATF special agents to participate in the operation. S/A McLaughlin was the only ATF special agent, who was forced to participate in the enforcement operation. The ATF case agent had already advised S/A McLaughlin that he had enough resources and did not require S/A McLaughlin assistance with the operation.

30. On or about May 30, 2013, RAC Darren Hampton refused to provide S/A McLaughlin copies of the complaint filed against S/A McLaughlin by TFO's in the ATF Raleigh Field Office.

31. On or about June 13, 2013, RAC Darren Hampton conducted Firearms Prosecution Training with an ATF Taskforce Officer, when RAC Hampton failed to even inform S/A McLaughlin of the scheduled training class in S/A McLaughlin's assigned county (Moore). S/A McLaughlin was repeatedly humiliated and embarrassed, when several local law enforcement officers inquired why the ATF supervisor would conduct ATF training with a local officer and not the ATF special agent. In addition, ASAC Debbie Bullock attended the training session and ASAC Bullock inquired as to why S/A McLaughlin did not attend the training class.

32. On or about July 16, 2013, RAC Darren Hampton attempted to take disciplinary action against S/A McLaughlin with the Charlotte Field Division, based on his false statement regarding a "Federal" search warrant in Montgomery County. RAC

16

Hampton falsely stated to Acting ASAC David Riddleberger that S/A McLaughlin had disobeyed a direct order to obtain a "Federal" search warrant in Montgomery County. RAC Hampton was fully aware of S/A McLaughlin obtaining a "state" search warrant, as RAC Hampton texted S/A McLaughlin asking if the "state" violation was listed in the search warrant. It is a known fact that "state" violations are not listed in "Federal" search warrants.

33. On or about July 16, 2013, RAC Darren Hampton humiliated and embarrassed S/A McLaughlin in the presence of local law enforcement, when RAC Hampton ordered the Montgomery County Sheriff's Office to cease and desist the execution of a "state" search warrant. Furthermore, ASAC Debbie Bullock advised RAC Hampton that he did not have the authority to give such an order to local law enforcement.

34. On or about July 29, 2013, RAC Darren Hampton harassed S/A McLaughlin, when RAC Hampton repeatedly told S/A McLaughlin how nice her hair looked and asked S/A McLaughlin if her hair was "weave" while standing inside S/A McLaughlin's office cubicle.

35. On or about July 29, 2013, RAC Darren Hampton refused to provide S/A McLaughlin a copy of the complaint filed by the TFO's in the ATF Field Office, when RAC Hampton was directed by ASAC Debbie Bullock to provide S/A McLaughlin a copy of the complaint.

36. On or about August 23, 2013, RAC Darren Hampton denied S/A McLaughlin's request to purchase a fan when the temperature inside the Fayetteville

Field Office was often in excess of 80 degrees during the summer season. Shortly thereafter, RAC Hampton paid $3,000 to remove hail dents from a spare GOV.

37. On or about August 29, 2013, RAC Darren Hampton placed S/A McLaughlin on the "duty agent" roster, when RAC Hampton was provided a doctor's excuse placing S/A McLaughlin on "sedentary duties" from an OWCP injury (broken toe) sustained during ATF mandatory (CATS) training.

38. On or about September 5, 2013, RAC Darren Hampton assigned S/A McLaughlin an EROD investigation from another "male" special agent's assigned county (Johnson, Eastern District of North Carolina) which was not consistent with the office policy. Furthermore, RAC Hampton was provided a doctor's excuse placing S/A McLaughlin on "sedentary duties" from an OWCP injury (broken toe) sustained during ATF mandatory (CATS) training. The EROD assignment would require a great deal of physical movement, as the EROD involved a high volume of field interviews.

39. On or about September 9, 2013, RAC Darren Hampton attempted to force S/A McLaughlin to participate in field training, when RAC Hampton was provided a doctor's excuse placing S/A McLaughlin on "sedentary duties" from an OWCP injury (broken toe) sustained during CATS training. RAC Hampton called S/A McLaughlin into his office and directed S/A McLaughlin to report to field training while S/A McLaughlin was still wearing a medical boot. RAC Hampton continued to berate S/A McLaughlin about not participating in ATF training. S/A McLaughlin stated that she would report for tactical training only if the ATF Training Instructor directed S/A McLaughlin to participate in field training with a "broken toe".

Case 1:19-cv-00318-CCE-JEP    Document 1    Filed 03/21/19    Page 18 of 62

40. On or about September 24, 2013, RAC Darren Hampton failed to inform S/A McLaughlin that the U.S. Attorney's Office would be implementing Project Safe Neighborhood (PSN) Program in S/A McLaughlin's assigned county (Lee). S/A McLaughlin had to receive notification from the assigned AUSA. In fact, the AUSA actually extended an invitation for S/A McLaughlin to attend the initial meeting at the U.S. Attorney's Office. The AUSA believed it was important for S/A McLaughlin to participate in the PSN meeting, as S/A McLaughlin was the primary LEO responsible for investigating the PSN cases.

41. On or about September 26, 2013, S/A McLaughlin contacted the Employee Assistance Program to seek formal EAP Counseling for the mounting stress/anxiety associated with the disparate treatment and hostile work environment inside the Fayetteville Field Office.

42. On October 1, 2013, S/A McLaughlin received an overall rating of 6 out of 7 on her Annual Performance Evaluation. Most importantly, S/A McLaughlin received a rating of 6 out of 7 in several elements including Teamwork and Collaboration, Relates to Others and Leading Others. Furthermore, S/A McLaughlin received a rating of 7 out of 7 in the elements of Communicate in Writing and Communicate Orally. RAC Darren Hampton failed to communicate or document any performance problems. Yet, RAC Darren Hampton and the Charlotte Field Division starting "counseling" S/A McLaughlin for poor performance after S/A McLaughlin reported the hostile work environment and disparate treatment of female employees in the Fayetteville Field Office.

43. On or about October 2, 2013, RAC Darren Hampton harassed S/A McLaughlin, when RAC Hampton repeatedly told S/A McLaughlin how nice she looked

19

in her business suit while following S/A McLaughlin around the conference at the U.S. Attorney's Office. As a result, S/A McLaughlin telephoned another female special agent regarding the sexual misconduct being committed by RAC Hampton. The female special agent stated that she had experienced two (2) sexual misconduct incidents (i.e. request for shoulder massage, ginding his groin against office furniture in a sexual manner) while assigned to the supervision of RAC Hampton.

44. On or about October 9, 2013, RAC Darren Hampton harassed S/A McLaughlin regarding the sick leave policy, when RAC Hampton intentionally deleted the attachment from his email containing the documentation to support S/A McLaughlin's sick leave request. Later, RAC Hampton would email S/A McLaughlin instructing S/A McLaughlin to submit the documentation to support the sick leave request.

45. On October 10, 2013, S/A McLaughlin was forced to take extended "sick leave" in order to address the overwhelming stress/anxiety resulting from the on-going harassment and disparate treatment from RAC Darren Hampton.

46. On or about October 29, 2013, RAC Darren Hampton advised S/A McLaughlin that it was S/A McLaughlin's job to resolve the conflict between the Sanford Police Department and the Lee County Sheriff's Office, when RAC Hampton refused to assist S/A McLaughlin with dealing with the problems in Lee County from a management level. S/A McLaughlin informed RAC Hampton that a "field agent" could not address thirty (30) years of animosity between the local police department and the

47. On or about October 29, 2013, RAC Darren Hampton advised S/A McLaughlin that she would be the only ATF special agent working the seven (7) counties in the Middle District of North Carolina, after the arrival of three (3) new "male" special agents in the Fayetteville Field Office.

48. On or about January 15, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton instructed S/A McLaughlin to attend a scheduled meeting (9:00 a.m.) with RAC Hampton and the ATF Taskforce Officer regarding Lee County. RAC Hampton departed the ATF office without conducting or canceling the meeting with S/A McLaughlin, who waited in the ATF office from approximately 8:45 a.m. – 2:00 p.m. for the meeting.

49. On or about January 22, 2014, RAC Darren Hampton continued his harassment, when the secretary failed to include S/A McLaughlin on an office email announcing an office luncheon. Upon coming into the office, S/A McLaughlin observed a flyer posted inside the secretary's office cubicle. Subsequently, the secretary confirmed with S/A McLaughlin that she had already emailed the information regarding the office luncheon. The secretary routinely failed to include S/A McLaughlin on office emails, including emails regarding her vacations. S/A McLaughlin observed several emails on the copy machine that were sent to "male" special agents with notification of the secretary's pending vacation schedule. In addition, the secretary routinely failed to respond to emails forwarded to the secretary by S/A McLaughlin.

50. On or about January 28, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton attempted to force S/A McLaughlin to participate in

21

CATS training, when RAC Hampton knew that S/A McLaughlin had not received a doctor's clearance from an OWCP injury (broken toe) sustained during CATS training.

51. On or about February 7, 2014, RAC Darren Hampton continued his harassment and humiliation, when RAC Hampton failed to notify S/A McLaughlin about ATF participation in Firearms Prosecution Training in S/A McLaughlin's assigned county (Lee). S/A McLaughlin had to learn of the "ATF" training from local law enforcement officers for the second time. Again, local law enforcement officers asked S/A McLaughlin, why do local officers always know about "ATF" training before the ATF special agent assigned to the area?

52. On or about February 19, 2014, S/A McLaughlin requested a temporary detail assignment to the ATF Training Academy in order to remove S/A McLaughlin from the hostile work environment inside the Fayetteville Field Office. ATF management officials denied the request by S/A McLaughlin.

53. On or about February 20, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton reported S/A McLaughlin to ASAC Debbie Bullock for having problems with professional demeanor, professional relationships and performance progress without having first "counseled" S/A McLaughlin regarding these issues in the Fayetteville Field Office. SAC Wayne Dixie was seeking retaliation, because S/A McLaughlin wrote an email requesting a temporary detail to the ATF Academy. In the email, S/A McLaughlin stated that the Charlotte Field Division had failed to address the Hostile Work Environment/Disparate Treatment of female special agents inside the Fayetteville Field Office. S/A McLaughlin received an email requesting a meeting in the

22

Charlotte Field Division. S/A McLaughlin was only being "counseled" regarding poor work performance in order to lay the foundation for the Letter of Expectations.

54. On or about February 24, 2014, ASAC Debbie Bullock conducted a "counseling" session with S/A McLaughlin in the Charlotte Field Division. ASAC C.J. Hyman and RAC Hampton were present during the meeting. SAC Wayne Dixie refused mediation, but elected to retaliate and harass S/A McLaughlin based on false information and unsupported accusations by RAC Hampton. SAC Dixie was clearly aware of RAC Hampton's history of such misconduct involving female special agents, as SAC Dixie had already authorized modifications to one (1) final Performance Evaluation that was written by RAC Hampton regarding the work performance of another female special agent.

55. On or about February 24, 2014, RAC Darren Hampton made false allegations that S/A McLaughlin was being difficult to manage, when RAC Hampton could not provide a single example to support his allegation in the presence of both ASAC Debbie Bullock and ASAC C.J. Hyman during a "counseling" meeting. ASAC Bullock and ASAC Hyman failed to produce a single witness or document (email, counseling memorandum, notes, etc.) during the counseling session to support negative work performance.

56. On or about February 24, 2014, RAC Darren Hampton made several allegations that the other special agents were complaining that S/A McLaughlin was causing a negative work environment in the Fayetteville Field Office. RAC Hampton could not identify a single special agent to support his allegation in the presence of both ASAC Debbie Bullock and ASAC C.J. Hyman during a "counseling" meeting. S/A

23

McLaughlin repeatedly requested the names of the special agents. However, ASAC Bullock and ASAC Hyman allowed RAC Hampton to make false/unsupported accusations against S/A McLaughlin. In fact, the ATF Taskforce Officer stated in his sworn declaration that "I got along with S/A McLaughlin just fine and I thought everyone else did also".

57. On or about February 24, 2014, RAC Darren Hampton made allegations that he questioned S/A McLaughlin's "judgment" in the presence of both ASAC Debbie Bullock and ASAC C.J. Hyman during a "counseling" meeting. RAC Hampton had recently appointed S/A McLaughlin as the Alternate Safety Officer in the Fayetteville Field Office. RAC Hampton made this appointment on February 19, 2014.

58. On or about March 19, 2014, RAC Darren Hampton again refused to check the status of an Internal Affairs investigation filed against S/A McLaughlin, when RAC Hampton always talks about how he supports his special agents. The ATF policy generally allows 120-days for the Office of Professional Responsibility & Security Operations (OPRSO) to conduct internal investigations. As a result, the pending investigation prevented S/A McLaughlin from applying for promotions, detail assignments and training conferences.

59. On or about March 26, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton stated to S/A McLaughlin during a meeting that "back in the fall you glared at the IA" and she felt threatened and intimidated by S/A McLaughlin. RAC Hampton failed to mention this incident in the 2013 Performance Evaluation or when RAC Hampton reported S/A McLaughlin to the Charlotte Field Division for the "counseling" meeting. This would have been a good example to provide

24

ASAC Debbie Bullock and ASAC C.J. Hyman during the "counseling" meeting. However, there was absolutely no mention of this incident until RAC Hampton started laying the foundation to support the "Letter of Expectations". RAC Hampton repeatedly and routinely made false statements against S/A McLaughlin without any accountability from ATF management officials.

60. On or about March 26, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton advised S/A McLaughlin that ASAC Debbie Bullock stated that S/A McLaughlin needed to "move forward and move on", as the problems with the work environment had been addressed by the Charlotte Field Division. At this point, SAC Wayne Dixie had failed to investigate or take any action regarding the hostile work environment and the disparate treatment of female special agents in the Fayetteville Field Office.

61. On or about March 26, 2014, SAC Wayne Dixie again denied mediation with a neutral party for the hostile work environment and disparate treatment of "female" special agents in the Fayetteville Field Office.

62. On or about April 2, 2014, S/A McLaughlin requested the assistance of the ATF Office of the Ombudsman in order to prevent the filing of a formal discrimination complaint against the Department of Justice. However, the Acting Ombudsman refused to intervene and referred S/A McLaughlin to the Office of Equal Opportunity to file a complaint.

63. On or about April 7, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton referred S/A McLaughlin to EAP Counseling and later refused to provide information requested by the EAP Counselor. The EAP Counselor requested

25

Case 1:19-cv-00318-CCE-JEP   Document 1   Filed 03/21/19   Page 25 of 62

RAC Hampton to identify the specific issues for which RAC Hampton was making the EAP referral. Furthermore, RAC Hampton was clearly aware of the fact that S/A McLaughlin was already receiving EAP Counseling.

64. On or about April 7, 2014, RAC Darren Hampton continued to hinder S/A McLaughlin's productivity, when RAC Hampton instructed S/A McLaughlin not to request the secretary to format/print memorandums for S/A McLaughlin, as the secretary was too busy to assist S/A McLaughlin. The secretary would routinely fail to provide a response to S/A McLaughlin's emails and often times S/A McLaughlin's case files were removed from the file cabinets. During a meeting, ASAC Debbie Bullock advised RAC Hampton that it was the secretary's job to provide administrative support to all special agents.

65. On or about April 7, 2014, RAC Darren Hampton again refused to meet with Chief, Sanford Police Department regarding their negative working relationship with the Lee County Sheriff's Office, when RAC Hampton was directed by ASAC Debbie Bullock on February 24, 2014 to meet with the Sanford Police Department. RAC Hampton refused to provide an ATF leadership presence in Lee County. As a result, ATF was not recognized in a newspaper article as even being a participant in the PSN Program in Lee County. Conversely, the FBI was not a participant in the PSN Program and the FBI was mentioned in the article.

66. On or about April 10, 2014, RAC Darren Hampton continued to hinder S/A McLaughlin's productivity, when RAC Hampton humiliated and embarrassed S/A McLaughlin in the presence of representatives from the U.S. Attorney's Office and local law enforcement, when RAC Hampton failed to properly introduce S/A McLaughlin

26

during a training class in her assigned county (Lee) in the same manner in which RAC Hampton introduced a "male" ATF special agent/TFO. If fact, RAC Hampton instructed the class participants (LEO) to contact the ATF Taskforce Officer should they need any ATF assistance.

67. On or about April 17, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton falsely stated that S/A McLaughlin could not indict a case in Grand Jury without first submitting the Recommendation for Prosecution. RAC Hampton did not have the same standard for "male" special agents assigned to the Fayetteville Field Office.

68. On or about April 17, 2014, RAC Darren Hampton intentionally held two (2) NICS case files inside his office for over two (2) months and falsely stated in S/A McLaughlin's Mid-Year Evaluation that the cases were still pending investigation by S/A McLaughlin. During a meeting, S/A McLaughlin provided a copy of the reports to ASAC Debbie Bullock to support this fact.

69. On or about April 17, 2014, RAC Darren Hampton stated in the Midyear Evaluation that S/A McLaughlin had incorrectly used reports to introduce documents without proper identification, chain of custody and other key information needed to prove the crime, when RAC Hampton had approved the reports with his signature and placed the reports in the case file. During a meeting, S/A McLaughlin provided a copy of the reports to ASAC Debbie Bullock to support this fact.

70. On or about April 17, 2014, RAC Darren Hampton stated in the Midyear Evaluation that several cases (Murder, Home Invasion, Armed Robbery) did not meet ATF Frontline requirements (Violent Crime).

27

71. On or about April 17, 2014, RAC Darren Hampton falsely stated in the Midyear Evaluation that S/A McLaughlin had not written an ROI in nearly five (5) months.

72. On or about May 5, 2014, RAC Darren Hampton issued S/A McLaughlin a Letter of Expectations requiring weekly meetings with RAC Hampton, supervisory approval to open criminal investigations and reporting daily agenda to RAC Hampton, when the Midyear Evaluation was based on false/ misleading information. RAC Hampton drafted the Letter Expectations. However, SAC Wayne Dixie personally reviewed and authorized the letter while visiting the Fayetteville Field Office on or about April 28, 2014. ASAC Debbie Bullock stated in a meeting that she had ever seen the Letter of Expectations and would not have issued the letter until the end of the performance period. This is why SAC Dixie ignored the "Chain of Command" to issue the Letter of Expectations without the consent of ASAC Bullock.

73. On or about May 5, 2014, RAC Darren Hampton falsely stated in the Letter of Expectations that he met with S/A McLaughlin regarding her performance on March 31, 2014, when RAC Hampton cannot produce a single text message, email or memorandum to support a meeting with S/A McLaughlin on this date.

74. On or about May 5, 2014, RAC Darren Hampton falsely stated in the Letter of Expectations that he met with S/A McLaughlin regarding her performance on April 7, 2014, when RAC Hampton only met with S/A McLaughlin less than five (5) minutes to issue S/A McLaughlin the EAP Referral Memorandum dated April 1, 2014.

75. On or about May 5, 2014, RAC Darren Hampton referenced "enforcement operations" in the Letter of Expectations, when RAC Hampton cannot produce a special

28

agent or any information to support that S/A McLaughlin has ever refused to participate in any enforcement operation. In fact, S/A McLaughlin volunteered to reschedule a doctor's appointment in order to assist another special agent in his enforcement operation.

76. On or about May 5, 2014, RAC Darren Hampton again refused in the presence of RAC David Riddleberger to contact any other law enforcement agency (i.e. Sanford Police Department, Chatham County Sheriff's Office, Siler City Police Department) regarding feedback on S/A McLaughlin's job performance in their respective counties. However, RAC Hampton stated that he did contact law enforcement to elicit feedback regarding S/A McLaughlin's work performance. In fact, RAC Hampton did not contact any Federal or local representatives regarding S/A McLaughlin's work performance because RAC Hampton knew that they would not support his false allegations. Moreover, RAC Hampton would not be able to justify the Letter of Expectations or the job restrictions that SAC Wayne Dixie used to continue his harassment and retaliation against S/A McLaughlin.

77. On or about May 12, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton informed S/A McLaughlin that the ATF Taskforce Officer would attend future meetings with RAC Hampton and S/A McLaughlin regarding S/A McLaughlin's performance reviews. S/A McLaughlin voiced her concerns of RAC Hampton's intentions of causing S/A McLaughlin further embarrassment and humiliation by having a "TFO" to attend her performance reviews with ASAC Debbie Bullock. RAC Darren Hampton confirmed his intentions to conduct the performance reviews in the presence of a "TFO". ASAC Debbie Bullock informed RAC Hampton that the ATF

29

Taskforce Officer would not attend any ATF performance review meetings in the Fayetteville Field Office.

78. On or about May 12, 2014, RAC Darren Hampton continued to hinder S/A McLaughlin's productivity, when RAC Hampton instructed S/A McLaughlin to personally test fire the firearms in S/A McLaughlin's investigations. RAC Hampton did not require the same of "male" special agents in the Fayetteville Field Office. S/A McLaughlin asked the "male" special agents assigned to the Fayetteville Field Office, if they were required to test fire firearms and they gave S/A McLaughlin a negative response. Afterward, S/A McLaughlin informed RAC Hampton of the disparity with the "male" special agents. Again, RAC Hampton stated that S/A McLaughlin could not submit a case report without completing the test fire of the firearms.

79. On or about May 12, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton instructed S/A McLaughlin not to use an "interview" as the opening report in S/A McLaughlin's investigation. Even though, RAC Hampton had already approved reports citing an "interview" as the opening report in past criminal investigations. S/A McLaughlin frequently used "interviews" with law enforcement officers as the "opening report" in criminal investigations. It was acceptable by ATF supervisors in the Tampa Field Division and the Dallas Field Division. During a meeting, S/A McLaughlin provided reports to ASAC Debbie Bullock to prove that RAC Hampton had previously signed these reports. In fact, S/A McLaughlin used "interviews" to open five (5) criminal investigations from January 2014 – April 2014. The Letter of Expectations was issued in May 2014 and RAC Hampton started refusing to sign these reports in May 2014.

30

80. On or about May 12, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton instructed S/A McLaughlin not to write a report of investigation (Case # 14-0041- Juvenile Homicide) for a witness interview conducted with the Sanford Police Department. Even though, RAC Hampton had just issued S/A McLaughlin a Letter of Expectations based partly on the lack of reports written by S/A McLaughlin.

81. On or about May 13, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton advised S/A McLaughlin that she needed prior supervisory notification for S/A McLaughlin to report to the ATF Raleigh Field Office in order to have a cellular telephone downloaded by another special agent. S/A McLaughlin has scheduled to meet the special agent in advance at the ATF Raleigh Field Office.

82. On or about May 14, 2014, ASAC Debbie Bullock convened another meeting with S/A McLaughlin and RAC Hampton in the Fayetteville Field Office. During the meeting, S/A McLaughlin gave ASAC Debbie Bullock several reports to prove that RAC Hampton had made several false/misleading statements in order to support the "Letter of Expectations". SAC Wayne Dixie still allowed RAC Hampton to harass S/A McLaughlin with the job restrictions contained in the "Letter of Expectations". Given RAC Hampton's history, SAC Dixie never requested feedback from other sources (AUSA, DA, local law enforcement, etc.) regarding S/A McLaughlin's job performance.

83. On or about May 14, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton stated to S/A McLaughlin in the presence of ASAC Debbie Bullock that the other special agents in the office told RAC Hampton that they did not want to work with S/A McLaughlin. RAC Hampton refused to specifically name any

31

special agent to support this allegation. In the presence of ASAC Bullock, RAC Hampton directed S/A McLaughlin not to ask the other special agents who made the comment.

84. On May 19, 2014, RAC Darren Hampton continued to hinder S/A McLaughlin's progress in Lee/Chatham County, when RAC Hampton assigned S/A McLaughlin a criminal investigation from Cumberland County, which has three (3) full-time law enforcement officers and several part-time officers assigned to Cumberland County.

85. On or about May 19, 2014, RAC Darren Hampton continued to humiliate and embarrass S/A McLaughlin in the presence of local law enforcement, when RAC Hampton instructed S/A McLaughlin "to hold a scene" until RAC Hampton's arrival in order to discuss the custody of the evidence in Cumberland County. S/A McLaughlin had previously informed RAC Hampton that the AUSA had already (telephonically) requested S/A McLaughlin to secure the evidence for Federal prosecution, as the agents on scene were employed by the State Bureau of Investigations.

86. On May 20, 2014, RAC Darren Hampton continued to hinder S/A McLaughlin's productivity, when RAC Hampton instructed S/A McLaughlin not to investigate three (3) cases that were referred by the AUSA for Federal prosecution. RAC Hampton was attempting to limit S/A McLaughlin's productivity in order to manufacture evidence (after-the-fact) to support the "Letter of Expectations" and the false statements inside the Mid-year Performance Evaluation. RAC Hampton

authorized S/A McLaughlin to conduct the investigations, after S/A McLaughlin informed the AUSA of his decision.

87. On or about June 2, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton stated that "I'm trying to help you get off this PIP", which clearly proves that SAC Wayne Dixie and RAC Hampton abused the "Letter of Expectations" because RAC Hampton could not support placing S/A McLaughlin on a "PIP" (Performance Improvement Plan) according to ATF policy. Six (6) months prior to the job restrictions, S/A McLaughlin's overall performance rating was 6 out of 7.

88. On or about June 9, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton stated that he was just "making small talk" and asked S/A McLaughlin if she was interested in applying for the CES Program. Ironically, RAC Hampton was "counseling" S/A McLaughlin for poor performance. Furthermore, RAC Hampton has constantly berated S/A McLaughlin regarding her work performance. Yet, RAC Hampton would ask S/A McLaughlin about applying for a collateral/specialized position.

89. On or about June 16, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton cancelled the "performance" meeting pursuant to his Letter of Expectations without any prior notification to S/A McLaughlin, who commuted 45 minutes to the Fayetteville Field Office.

90. On or about June 17, 2014, ASAC Debbie Bullock convened another meeting with S/A McLaughlin and RAC Hampton in the Fayetteville Field Office. RAC Darren Hampton continued his harassment, when RAC Hampton falsely stated to S/A

33

Case 1:19-cv-00318-CCE-JEP   Document 1   Filed 03/21/19   Page 33 of 62

McLaughlin in the presence of ASAC Debbie Bullock that RAC Hampton never stated that the other special agents in the office told RAC Hampton that they did not want to work with S/A McLaughlin. In fact, ASAC Bullock reminded RAC Hampton that he did make the statement during the last meeting.

91. On or about June 19, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton responded to Sanford, North Carolina within 24-hours to investigate a citizen complaint filed against S/A McLaughlin. RAC Hampton had repeatedly refused to report to the Sanford Police Department in order to assist S/A McLaughlin in Sanford, North Carolina. Even after ASAC Debbie Bullock directed him, RAC Hampton still refused to meet with the Sanford Police Department.

92. On or about June 19, 2014, RAC Darren Hampton refused to accept statements written by officers from the Sanford Police Department regarding the citizen complaint, when RAC Hampton was telling S/A McLaughlin that he was trying to address the citizen complaint. S/A McLaughlin telephoned ASAC Debbie Bullock and ASAC Bullock instructed S/A McLaughlin to obtain copies of the LEO statements and forward the statements to RAC Hampton.

93. On or about June 19, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton instructed S/A McLaughlin to cancel a witness interview in order to report to the ATF office regarding the citizen complaint. RAC Hampton falsely stated that ASAC Debbie Bullock was the person who ordered S/A McLaughlin to report to the ATF office. S/A McLaughlin telephoned ASAC Bullock and she instructed S/A McLaughlin to write the statement at the Sanford Police

34

Department. ASAC Bullock further instructed S/A McLaughlin to email the statements to RAC Hampton.

94. On or about June 26, 2014, RAC Darren Hampton telephoned S/A McLaughlin and verbally harassed S/A McLaughlin regarding a recent three (3) day suspension. At approximately 10:00 a.m., RAC Hampton telephoned S/A McLaughlin on her cellular telephone. RAC Hampton jokingly stated that he "needed a day off work" and further asked if S/A McLaughlin could approve his day-off work. In addition, RAC Hampton starting to laugh on the telephone. S/A McLaughlin advised RAC Hampton to contact the Charlotte Field Division regarding his leave and elected not to further engage RAC Hampton.in matter. According to the EEO Counseling Report, RAC Hampton only contacted S/A McLaughlin because S/A McLaughlin did not contact him after the suspension. Conversely, RAC Hampton only telephoned S/A McLaughlin in order to continue his relentless harassment and humiliation of S/A McLaughlin. At approximately 8:37 a.m., RAC Hampton left a voice message on S/A McLaughlin's telephone instructing S/A McLaughlin to check into the Fayetteville Field Office. By this time, S/A McLaughlin was already inside the ATF office before the 9:00 a.m. "policy" deadline. In fact, S/A McLaughlin scanned a document into the ATF copy machine at 8:40 a.m. Furthermore, S/A McLaughlin went to RAC Hampton's office door to let RAC Hampton know that S/A McLaughlin was back in service. Shortly thereafter, S/A McLaughlin departed the Fayetteville Field Office and drove to the Sanford Police Department. Upon entering the police department, S/A McLaughlin

35

received the harassing telephone call from RAC Hampton. Therefore, RAC Hampton falsely stated that he contacted S/A McLaughlin in accordance with the office policy.

95. On or about July 7, 2014, RAC Darren Hampton verbally berated S/A McLaughlin regarding a citizen complaint in Sanford, N.C. RAC Hampton stated it sounds like you went in there like you had an arrest warrant and warned S/A McLaughlin about violating a citizen's 4th amendment rights. Even though, the statements written by three (3) law enforcement officers did not support RAC Hampton's assessment.

96. On or about July 7, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton stated during a meeting that he had heard that S/A McLaughlin had filed an EEO Complaint against SAC Wayne Dixie and too let him know, if RAC Hampton could do anything to assist with the EEO Complaint.

97. On or about July 14, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton failed to conduct another "performance" meeting pursuant to his Letter of Expectations without any prior notification to S/A McLaughlin who commuted 45 minutes to the Fayetteville Field Office.

98. On or about July 14, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton failed to provide written documentation to S/A McLaughlin regarding the removal of S/A McLaughlin from the job restrictions or the status of the Letter of Expectations.

99. On or about July 22, 2014, RAC Darren Hampton continued his disparate treatment and harassment, when RAC Hampton refused to accept "Xerox" copies of conviction records located inside S/A McLaughlin's Recommendation for

Case 1:19-cv-00318-CCE-JEP    Document 1    Filed 03/21/19    Page 36 of 62

Prosecution. In fact, RAC Hampton returned the case report and advised S/A McLaughlin in his written note that the documentation "needs to be certified". However, a search of ATF investigative case files revealed that SAC Wayne Dixie and RAC Hampton did not have the same standard for "male" special agents assigned to the Fayetteville Field Office. In fact, SAC Wayne Dixie authorized at least two (2) Recommendations for Prosecution (15-0022; 14-0026) which contained "Xerox" copies of conviction records. These reports were authorized after the return of S/A McLaughlin's case report. In addition, SAC Wayne Dixie also allowed "male" special agents to submit their Recommendations for Prosecution without submitting documentation for other elements of the crime (Interstate Nexus, Fingerprint Comparison, etc.). RAC Hampton constantly berated S/A McLaughlin and verbally humiliated S/A McLaughlin regarding her work product. RAC Hampton told S/A McLaughlin that she could not submit a case report without proper documentation for all elements of the crime. SAC Dixie and RAC Hampton clearly had a different standard for "female" special agents in the Fayetteville Field Office.

100. On or about July 24, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton again falsely accused SA McLaughlin of becoming "aggressive and argumentative" during a conversation with RAC Hampton and the secretary only after RAC Hampton communicated with the secretary. First of all, RAC Hampton did not voice any concerns with S/A McLaughlin's interaction during the conversation. Secondly, RAC Hampton did not voice any concerns when RAC Hampton responded to S/A McLaughlin's email regarding the incident. Most importantly, RAC Hampton failed to document this "aggressive and argumentative"

behavior inside the 2014 Performance Evaluation. Given that S/A McLaughlin was still being "counseled", RAC Hampton surely would have documented this incident during the rating period. According to RAC Hampton's email, the secretary felt threatened by S/A McLaughlin's aggressive and accusatory tone. Yet, RAC Hampton elected to address the matter two (2) days later via email.

101. On or about August 14, 2014, RAC Darren Hampton continued his harassment, humiliation and embarrassment of S/A McLaughlin in the presence of other Federal/local LEO's, when RAC Hampton failed to make supervisory notification for S/A McLaughlin to participate in a pending enforcement operation with other "male" special agents assigned to the Fayetteville Field Office. RAC Hampton was currently "counseling" S/A McLaughlin's about the lack of participation in enforcement operations during his performance reviews. The Fayetteville Field Office was participating in tactical training with other employees from the Charlotte Field Division. RAC Hampton authorized all "male" special agents and taskforce officers to depart the training session. Conversely, RAC Hampton did not allow S/A McLaughlin to leave the training session or participate in the enforcement operation. During a meeting, ASAC Debbie Bullock advised RAC Hampton that another ATF employee came to her and expressed how badly the above decision reflected upon RAC Hampton and the Fayetteville Field Office.

102. On or about August 25, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton refused S/A McLaughlin the opportunity to utilize "agent cashier funds", while complaining about S/A McLaughlin's lack of use regarding "agent cashier funds" during his performance reviews. S/A McLaughlin

38

explained the position of the AUSA and RAC Hampton advised S/A McLaughlin that the USAO was "just using her". In addition, S/A McLaughlin advised ASAC Debbie Bullock of the matter. Coincidentally, another female special agent was not allowed to use "agent cashier funds" in the same manner as "male" special agents assigned to the Fayetteville Field Office.

103. On or about September 4, 2014, RAC Darren Hampton continued his harassment, humiliation and embarrassment of S/A McLaughlin in the presence of other Federal/local LEO's, when RAC Hampton attended a PSN meeting in Lee County and refused to verbally participate in any aspects of the meeting regarding "gun violence" with the U.S. Attorney's Office (AUSA's), District Attorney's Office (ADA), Sanford Police Department (Chief) and the Lee County's Sheriff's Office.

104. On or about September 4, 2014, RAC Darren Hampton continued his harassment, humiliation and embarrassment of S/A McLaughlin in the presence of other Federal/local LEO's, when RAC Hampton attended a PSN meeting in Lee County and abruptly walked out of the meeting before the meeting concluded and other participants verbally remarked that RAC Hampton's departure was "rude and unprofessional".

105. On or about September 5, 2014, ASAC Debbie Bullock convened another meeting with S/A McLaughlin and RAC Hampton in the Charlotte Field Division. S/A McLaughlin again expressed her disappointment with the lack of action taken by SAC Wayne Dixie and concerns for her physical safety under the leadership of RAC Hampton. ASAC Bullock stated that mediation was denied based on guidance from the Bureau's EEO Office. During the meeting, S/A McLaughlin provided ASAC

39

Bullock with a copy of the statement written by another female special agent regarding the disparate treatment and sexual misconduct committed by RAC Hampton. ASAC Bullock departed her office with the document and met with SAC Wayne Dixie inside his office. SAC Dixie failed to report the sexual misconduct to the ATF Internal Affairs Division for immediate investigation, as SAC Dixie was also aware of the two (2) sexual advances made by RAC Hampton toward S/A McLaughlin inside the Fayetteville Field Office.

106. On September 5, 2014, ASAC Debbie Bullock officially recommended that S/A McLaughlin be removed from the supervision of RAC Darren Hampton. However, SAC Wayne Dixie refused to transfer S/A McLaughlin or RAC Hampton from the Fayetteville Field Office.

107. On or about September 5, 2014, SAC Wayne Dixie continued his harassment, when SAC Dixie rescinded ASAC Debbie Bullock's decision to temporarily detail RAC Darren Hampton to the Charlotte Field Division for thirty (30) days. Previously, ASAC Debbie Bullock stated that it was clear that RAC Hampton and S/A McLaughlin could no longer both work inside the Fayetteville Field Office. Therefore, ATF Headquarter would be making the decision to transfer one (1) from the office. During the meeting, ASAC Bullock decided that RAC Hampton would be temporarily detailed to the Charlotte Field Division.

108. On or about September 5, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton again failed to provide written documentation to S/A McLaughlin regarding S/A McLaughlin's removal from the job restrictions or

the status of the Letter of Expectations. During the meeting, RAC Hampton was verbally instructed to provide the documentation by ASAC Debbie Bullock.

109. On or about September 8, 2014, SAC Wayne Dixie continued his harassment and retaliation, when S/A McLaughlin was told she would be temporarily detailed for thirty (30) days to the Greensboro Field Office. SAC Dixie elected to penalize the "victim" for reporting the violations of the EEO Policy. Furthermore, SAC Dixie stated that S/A McLaughlin was temporarily assigned to the Greensboro Field Office in order to "investigate" the safety concerns. After the reassignment, S/A McLaughlin was never contacted by the Charlotte Field Division or OPRSO regarding any investigation into the safety concerns. S/A McLaughlin actually received an email from RAC Hampton regarding SAC Dixie's decision. Later, ASAC Bullock stated that S/A McLaughlin would be detailed to Greensboro, North Carolina for thirty (30) days until the final decision was made by ATF Headquarters. However, no decision was ever made by ATF Headquarters.

110. On or about September 9, 2014, SAC Wayne Dixie continued his harassment and retaliation, when S/A McLaughlin was forced to commute approximately six (6) hours to the Charlotte Field Division after SAC Dixie refused to provide S/A McLaughlin written documentation regarding her temporary detail assignment to the Greensboro Field Office. S/A McLaughlin was ultimately detailed for approximately sixty (60) days, which was the reason for the refusal to provide written documentation. Furthermore, the lack of written documentation or official reporting instructions was instrumental in SAC Dixie not paying travel expenses in accordance with DOJ/ATF Travel Policy. SAC Dixie stated that "this is up to the

41

discretion of the SAC". According to DOJ/ATF policy, S/A McLaughlin was entitled to receive "per diem" for the detail assignment to the Greensboro Field Office.

111. On or about September 16, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton and the secretary removed S/A McLaughlin's name tag from S/A McLaughlin's office mailbox and Xerox/scanner machine inside the Fayetteville Field Office. S/A McLaughlin was still assigned to the Fayetteville Field Office. Again, S/A McLaughlin reported this incident to ASAC Debbie Bullock.

112. On or about September 16, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton telephoned the RAC (Greensboro Field Office) to complain about S/A McLaughlin's presence inside the Fayetteville Field Office. S/A McLaughlin was reviewing a criminal case file that was still maintained inside RAC Hampton's office. Subsequently, S/A McLaughlin was instructed not to enter the Fayetteville Field Office without supervisory notification to the RAC (Greensboro Field Office).

113. On September 24, 2014, S/A McLaughlin was forced to take extended "sick leave" in order to address the overwhelming stress/anxiety resulting from the on-going harassment and disparate treatment from SAC Wayne Dixie and RAC Darren Hampton.

114. On or about October 6, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton intentionally failed to provide S/A McLaughlin the new access code for the office doors inside the Fayetteville Field Office. S/ A McLaughlin was locked out of the office and had to wait for another special agent to gain access inside the office in order to retrieve her ATF computer. Again, S/A

42

McLaughlin reported this incident to ASAC Debbie Bullock in a very lengthy telephone conversation. S/A McLaughlin advised ASAC Bullock that RAC Hampton's actions were intentional and malicious toward S/A McLaughlin. RAC Hampton did not give S/A McLaughlin the office access code, but RAC Hampton did have time to assign S/A McLaughlin to be his "duty agent" for the Thanksgiving holiday without the benefit of submitting her "use or lose" leave.

115. On or about October 6, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton failed to direct the secretary to enter S/A McLaughlin's arrest warrant into the computer system when S/A McLaughlin was in a "sick leave" status. During this time, S/A McLaughlin was temporarily detailed to the Greensboro Field Office. In the Fayetteville Field Office, it was normal protocol for the secretary to enter arrest warrants into the computer system for "male" special agents. S/A McLaughlin has routinely observed the secretary informing "male" special agents and TFO that she entered their arrest warrants into the computer without any prior instruction. However, the secretary placed S/A McLaughlin's arrest warrant inside a "privacy" envelope and mailed the arrest warrant via regular mail to the Greensboro Field Office. Furthermore, S/A McLaughlin emailed the secretary with no response from her. RAC Hampton and the secretary ignored the ATF policy (24 hour computer entry) and showed very little regard for public safety regarding the matter. Again, S/A McLaughlin reported this incident to ASAC Debbie Bullock and ASAC Bullock advised S/A McLaughlin that she would be notifying SAC Wayne Dixie. Later, SAC Dixie stated that S/A McLaughlin should have telephoned the secretary regarding the arrest warrant. However, SAC Dixie did not

have the same requirement for "male" special agents assigned to the Fayetteville Field Office.

116. On or about October 6, 2014, RAC Darren Hampton continued his disparate treatment, when RAC Hampton intentionally failed to provide S/A McLaughlin the opportunity to submit her "use or lose" leave and her vacation schedule for consideration on the "duty agent" roster. RAC Hampton gave "male" special agents the opportunity to submit vacation schedules, prior to finalizing the "duty agent" roster. However, RAC Hampton failed to provide S/A McLaughlin the same opportunity to submit a vacation schedule. After reporting the disparate treatment to ASAC Debbie Bullock, the email notification was forwarded from the secretary requesting S/A McLaughlin's leave schedule for the new "duty agent" roster.

117. On or about October 23, 2014, RAC Darren Hampton stated in S/A McLaughlin's 2014 Annual Performance Evaluation that two (2) NICS cases were still pending investigation. However, RAC Hampton signed the ROI's in February 2014. RAC Darren Hampton intentionally held these case files inside his office for over two (2) months, after approving the ROI's.

118. On or about October 23, 2014, RAC Darren Hampton stated in S/A McLaughlin's 2014 Annual Performance Evaluation that S/A McLaughlin had incorrectly used reports (763040-14-0018) to introduce documents without proper identification, chain of custody and other key information needed to prove the crime. However, RAC Hampton had approved the ROI's with his signature and placed the reports in the case file without any indication of a problem. Coincidentally, the

44

defendant pled guilty to Kidnapping and he was sentenced to 33 years in Federal prison.

119. On or about October 23, 2014, RAC Darren Hampton stated in S/A McLaughlin's 2014 Annual Performance Evaluation that several cases (13-0058, 13-0059, 13-0060, 13-0067, 13-0077) did not meet Frontline objective or lacked investigative merit. However, RAC Hampton signed the Recommendation for Prosecution in two (2) of the investigations (13-0067, 13-0077) and these cases were indicted in the Middle District of North Carolina.

120. On or about October 23, 2014, RAC Darren Hampton stated in S/A McLaughlin's 2014 Annual Performance Evaluation that S/A McLaughlin used polygraph examinations as an opening report. In ATF Investigation # 14-0093, the ATF Polygraph Examiner did generate his ROI prior to the generation of the "opening" ROI. However, S/A McLaughlin made the necessary adjustments and his ROI was not the "opening report" for my investigation. Again, the ROI was approved by the ARAC with his signature and placed inside the case file without any indication of a problem.

121. On or about October 23, 2014, RAC Darren Hampton stated in S/A McLaughlin's 2014 Annual Performance Evaluation that S/A McLaughlin had not indicted a suspect this FY. Conversely, ASAC Debbie Bullock stated that "it appears that your case production earned you the number 2 spot in the Fayetteville Office". In fact, S/A McLaughlin had indictments in nine (9) criminal investigations during the fiscal year.

122. On or about November 3, 2014, ASAC Debbie Bullock convened another meeting with S/A McLaughlin and RAC Darren Hampton in the Fayetteville Field Office. ASAC Bullock forced S/A McLaughlin to postpone Federal trial preparation in order to meet with ASAC Bullock and RAC Hampton. However, RAC Hampton failed to attend the meeting.

123. On or about November 3, 2014, SAC Wayne Dixie continued his harassment and retaliation, when S/A McLaughlin was reassigned back into the hostile work environment inside the Fayetteville Field Office. During the meeting, ASAC Debbie Bullock stated that ATF Headquarters had not made a decision regarding S/A McLaughlin or RAC Hampton being transferred from the Fayetteville Field Office. Furthermore, ASAC Bullock attempted to convince S/A McLaughlin to "volunteer" for the transfer to the Greensboro Field Office. In fact, ASAC Bullock stated that S/A McLaughlin could continue her liaison assignments with Lee/Chatham County, as the Charlotte Field Division was in the process of realigning the counties. S/A McLaughlin informed ASAC Bullock that S/A McLaughlin had paid the PCS move from Dallas, Texas to the Fayetteville Field Office using her personal funds and paid to build a new house in the process. S/A McLaughlin further advised ASAC Bullock that S/A McLaughlin would never "volunteer" to relocate, as S/A McLaughlin had not done anything wrong.

124. On or about November 4, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton sent S/A McLaughlin an email to "welcome" S/A McLaughlin back into his hostile work environment inside the Fayetteville Field Office.

125. On or about November 7, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton refused to grant S/A McLaughlin authorization to release an ATF case report to the Chatham County District Attorney's Office. The AUSA had already granted S/A McLaughlin permission to release the case report.

126. On or about November 18, 2014, SAC Wayne Dixie convened another meeting with S/A McLaughlin, RAC Hampton and ASAC Bullock in the Charlotte Field Division. SAC Dixie continued his harassment, when S/A McLaughlin was told that she and RAC Darren Hampton would continue working inside the Fayetteville Field Office. Specifically, SAC Dixie stated that "RAC Hampton isn't going anyplace". At that time, S/A McLaughlin verbally requested to be transferred to the Greensboro Field Office. SAC Dixie replied that S/A McLaughlin was not going to dictate her office assignment. Therefore, SAC Dixie continued to intentionally subject S/A McLaughlin to the on-going disparate treatment and hostile work environment inside the Fayetteville Field Office.

127. On November 20, 2014, S/A McLaughlin was forced to take extended "sick leave" in order to address the overwhelming stress/anxiety resulting from the on-going harassment and disparate treatment from SAC Wayne Dixie and RAC Darren Hampton.

128. On or about November 24, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton assigned S/A McLaughlin to be "duty agent" for three (3) consecutive holidays (Christmas, New Year's, MLK Birthday) with eight (8) special agents assigned to the Fayetteville Field Office.

129. On or about November 24, 2014, RAC Darren Hampton continued his harassment, when RAC Hampton refused to approve S/A McLaughlin's "use or lose" leave by the ATF mandatory deadline for restoration by the agency.

130. On or about December 8, 2014, RAC Darren Hampton continued his harassment and disparate treatment, when RAC Hampton failed to attend and refused to appoint another ATF special agent to attend the Project Safe Neighborhood (PSN) Call-In Meeting at the request of the U.S. Attorney's Office. RAC Hampton was instructed to attend by ASAC Debbie Bullock, but claimed to be sick after working eight (8) hours in the ATF office.

131. On or about December 12, 2014, RAC Darren Hampton continued his harassment and disparate treatment, when RAC Hampton intentionally held a case referral from S/A McLaughlin for eight (8) months inside his office. The case referral was transferred to RAC Hampton in April 2014, prior to the issuance of the "Letter of Expectations". During this time, RAC Hampton was "counseling" S/A McLaughlin for low productivity and poor work performance.

132. On or about February 2, 2015, RAC Darren Hampton wrote a misconduct complaint against S/A McLaughlin for "Misuse of GOV and Conduct Unbecoming" with the Internal Affairs Division. SAC Wayne Dixie intentionally allowed RAC Darren Hampton to "taint" the investigation against S/A McLaughlin by allowing RAC Hampton to conduct the preliminary witness interviews, after S/A McLaughlin had repeatedly reported misconduct/integrity violations against RAC Darren Hampton to SAC Wayne Dixie. SAC Wayne Dixie also failed to instruct S/A McLaughlin to discontinue patronizing the business, due to the citizen complaint and

the obvious "safety" concerns reported by RAC Darren Hampton. In fact, RAC Hampton filed his misconduct complaint on February 2, 2015 and instructed S/A McLaughlin to pick-up her GOV from the same business on March 17, 2015.

133. On or about February 9, 2015, RAC Darren Hampton continued his harassment, when RAC Hampton orally reprimanded S/A McLaughlin in the presence of other "male" special agents regarding S/A McLaughlin giving him advance notice of sick leave usage or risk being placed on AWOL status. In fact, RAC Hampton had received email notification from S/A McLaughlin regarding the medical appointment in association with a deer hitting her personal vehicle.

134. On February 24, 2015, S/A McLaughlin was forced to take extended "sick leave" in order to address the overwhelming stress/anxiety resulting from the on-going harassment and disparate treatment from SAC Wayne Dixie and RAC Darren Hampton.

135. On or about March 17, 2015, RAC Darren Hampton continued his harassment, when RAC Hampton refused to grant S/A McLaughlin authorization to release an ATF case report to the Chatham County District Attorney's Office. The AUSA had already granted S/A McLaughlin permission to release the case report.

136. On or about March 30, 2015, the Office of Professional Responsibility and Security Office (OPRSO) denied S/A McLaughlin an "employee interview" during their official inspection of the Charlotte Field Division. RAC Darren Hampton instructed employees to complete the survey regarding the office inspection. The survey instructed employees to notify the inspection team directly, if the employee wanted to be interviewed during the office inspection. Therefore, S/A McLaughlin

49

informed RAC Hampton that she wished to be interviewed during the office inspection. However, OPRSO denied the interview and only allowed S/A McLaughlin to submit documentation regarding the harassment, retaliation and disparate treatment of "female" special agents inside the Fayetteville Field Office.

137. On or about April 6, 2015, RAC Darren Hampton continued his harassment, when RAC Hampton intentionally failed to authorized a Recommendation for Prosecution that was submitted by S/A McLaughlin in a timely manner. As a result, the AUSA was forced to reschedule the indictment of a Federal investigation (# 15-0057).

138. On or about April 8, 2015, S/A McLaughlin forwarded the integrity/misconduct violations involving RAC Darren Hampton to the Office of Special Counsel. By this time, Acting Director Thomas Brandon and Acting Deputy Director Ron Turk were both aware of the countless violations and both refused to address the on-going harassment, disparate treatment and hostile work environment inside the ATF Fayetteville Field Office.

139. On April 9, 2015, RAC Darren Hampton continued his harassment, when S/A McLaughlin arrived into the office and found "signed" Reports of Investigation inside her office mailbox. The normal protocol for any ATF enforcement group would be for the "Investigative Assistant" to create a case file. Prior to this instance, the secretary had always created the case files. Nevertheless, S/A McLaughlin removed the reports and requested the secretary to create the case file. Later the same day, S/A McLaughlin observed several new case files inside the filing cabinet that were empty. Thus, the secretary created new case files without receiving any "ROIs"

in the investigation and failed to create a new case file when she did have "signed ROIs" for the investigation.

140. On or about April 16, 2015, RAC Darren Hampton continued his harassment, when RAC Hampton intentionally failed to include several investigative functions in his Mid-year Performance Evaluation that were performed by S/A McLaughlin during the rating period. RAC Hampton intentionally generated the Mid-year evaluation early in order to exclude investigative activity conducted by S/A McLaughlin. RAC Hampton was clearly informed of two (2) cellular phone search warrants obtained by S/A McLaughlin and one (1) criminal trial during the rating period. Lastly, RAC Hampton intentionally held a case report until after he generated the Mid-year evaluation. Thus, S/A McLaughlin had submitted two (2) case reports and three (3) additional defendants in S/A McLaughlin's investigations were indicted in the Middle District of North Carolina.

141. On or about April 17, 2015, RAC Darren Hampton continued his harassment, when S/A McLaughlin arrived in the ATF Fayetteville Field Office and observed a "small" parcel package addressed to S/A McLaughlin, sitting on the floor beside the trash can inside her office cubicle. The parcel package could be seen by anyone who was walking down the main aisle inside the office. During this time, S/A McLaughlin was intentionally not coming into the ATF office in order to avoid further harassment from RAC Hampton. Conversely, S/A McLaughlin observed several packages that were placed on the top of the desks occupied by "male" special agents in the Fayetteville Field Office. This was perhaps the most humiliating experience of S/A McLaughlin's career as a "Federal" law enforcement officer. S/A

51

McLaughlin decided to take photographs, as she didn't think anyone outside of the ATF would ever believe that "female" special agents are forced to retrieve their mail from the floor inside a "Federal" law enforcement agency.

142. On or about May 4, 2015, SAC Wayne Dixie convened another meeting with S/A McLaughlin, RAC Rourke Wright and ASAC Debbie Bullock in the Charlotte Field Division. SAC Dixie continued his harassment, when S/A McLaughlin was informed that she would be forced to sell her private residence in order for S/A McLaughlin to be removed from the hostile work environment inside the Fayetteville Field Office.

143. On or about May 4, 2015, SAC Wayne Dixie continued his harassment, disparate treatment and retaliation, when SAC Dixie issued S/A McLaughlin a second "Letter of Expectations" without justification and without officially removing S/A McLaughlin from the job restrictions listed in the Letter of Expectations that he previously authorized in April 2014. During the meeting, SAC Dixie admitted to never issuing a "Letter of Expectations" to a special agent from the SAC position.

144. On May 7, 2015, S/A McLaughlin was forced to take extended "sick leave" in order to address the overwhelming stress/anxiety resulting from the on-going retaliation, harassment and disparate treatment from SAC Wayne Dixie and RAC Darren Hampton.

145. On or about May 11, 2015, S/A McLaughlin was informed by the Office of Professional Responsibility and Security Office (OPRSO) that she would be the subject of a third (3rd) Internal Affairs Investigation. Prior to the notification, S/A McLaughlin met with SAC Wayne Dixie regarding S/A McLaughlin's request to be

Case 1:19-cv-00318-CCE-JEP    Document 1    Filed 03/21/19    Page 52 of 62

transferred to the Greensboro Field Office. According to OPRSO, the complaint (Misuse of GOV, Conduct Unbecoming a Special Agent) was filed against S/A McLaughlin in February 2015 and written by RAC Hampton. SAC Wayne Dixie filed the complaint against S/A McLaughlin, after SAC Dixie had already refused to assign S/A McLaughlin a reliable GOV. In fact, SAC Dixie assigned other ATF vehicles to local taskforce officers without assigning S/A McLaughlin a reliable GOV. Based on criteria set by RAC Darren Hampton, S/A McLaughlin was eligible to receive a new GOV in September 2014. Instead, RAC Hampton assigned the "new" GOV to a "male" special agent. Furthermore, RAC Hampton failed to assign S/A McLaughlin an "old" GOV when RAC Hampton violated his own criteria by not assigning S/A McLaughlin the "new" GOV. Coincidentally, RAC Hampton received two (2) GOV's from the Charlotte Field Division and S/A McLaughlin was still forced to drive an unreliable GOV. In addition, SAC Dixie repeatedly refused to investigate RAC Hampton in accordance with ATF policy. Conversely, SAC Dixie allowed RAC Hampton to write this complaint against S/A McLaughlin.

146. On or about May 27, 2015, RAC Darren Hampton continued his harassment, when RAC Hampton failed to direct the secretary to enter S/A McLaughlin's three (3) arrest warrants into the computer system. During this time, S/A McLaughlin was forced to take extended "sick leave" until the departure of RAC Hampton from the Fayetteville Field Office. Again, RAC Hampton and the secretary ignored the ATF policy (24 hour computer entry) and showed very little regard for public safety regarding the matter. The secretary finally entered the arrest warrants into the computer on June 2, 2015. Given that SAC Wayne Dixie condoned the last

53

incident involving S/A McLaughlin's arrest warrant, S/A McLaughlin did not see any reason to continue to report the lack of administrative support from the secretary.

147. On or about June 7, 2015, RAC Darren Hampton continued his harassment, when RAC Hampton refused to sign/approve several case reports submitted by S/A McLaughlin in support of Federal prosecution. S/A McLaughlin submitted several Recommendations for Prosecution. In fact, one (1) case report was actually delivered to the Fayetteville Field Office by an ATF Industry Operations Investigator on May 18, 2015. Subsequently, RAC Hampton refused to grant approval for the Recommendations for Prosecution (# 15-0005, 15-0050, 15-0056, 15-0058) submitted on May 15, 2015. However, RAC Hampton approved several Recommendations for Prosecution (# 15-0065, 15-0070, 15-0071) for "male" special agents prior to S/A McLaughlin's submission on May 12, 2015. Most importantly, RAC Hampton granted approval for several Recommendations for Prosecution (# 15-0051, 15-0052, 15-0054, 15-0055, 14-101) for "male" special agents after S/A McLaughlin's submission on June 3, 2015. S/A McLaughlin's case reports were finally approved by the Acting RAC on June 9, 2015 and mailed to the USAO on June 10, 2015. Due to the intentional delays by RAC Hampton, it took approximately one (1) month for the AUSA to receive S/A McLaughlin's case reports on June 16, 2015.

148. On or about June 10, 2015, RAC Darren Hampton continued his harassment, when RAC Hampton posted his "Letter of Commendation" from the U.S. Attorney's Office to the exterior of his office door. S/A McLaughlin believe that RAC Hampton did so, because OPRSO refused to properly investigate RAC

54

Hampton in accordance with ATF policy. RAC Hampton wanted S/A McLaughlin to see that RAC Hampton's reputation was still intact, even after the sexual misconduct and the unfair treatment of two (2) female special agents assigned to the Fayetteville Field Office. Coincidentally, the letter was removed from the office door prior to the arrival of special agents from the Internal Affairs Division (IAD) who were working in the Fayetteville Field Office.

149. On or about June 30, 2015, RAC Darren Hampton was allowed back into the Fayetteville Field Office after being transferred to ATF Headquarters (Reporting Date: June 12, 2015) in order to continue his harassment against S/A McLaughlin. RAC Hampton and the secretary placed a black plastic bag on a chair inside S/A McLaughlin office cubicle. The cleaning staff uses clear/white plastic bags inside the trash cans in the Fayetteville Field Office. RAC Hampton was harassing S/A McLaughlin regarding SAC Wayne Dixie's decision to force S/A McLaughlin to sell her personal residence in order to relocate to Greensboro, North Carolina.

150. On or about June 30, 2015, SAC Wayne Dixie continued his harassment and disparate treatment, when S/A McLaughlin's telephone system was downgraded to a smaller system. S/A McLaughlin attempted to use the telephone inside her cubicle and S/A McLaughlin realized the telephone system had been replaced for a smaller system. S/A McLaughlin checked the telephone systems inside the offices cubicle of "male" special agents assigned to the Fayetteville Field Office. S/A McLaughlin observed that their telephone systems were not downgraded in the same manner as S/A McLaughlin. During this time, S/A McLaughlin was still assigned to the

Fayetteville Field Office and currently occupying the desk with her ATF/personal property still inside the office cubicle.

151. On July 24, 2015, S/A McLaughlin was officially reassigned to the Greensboro Field Office. As a result, S/A McLaughlin accepted a reduction in her annual salary of $3,500. This financial burden is due solely to the refusal of Director Thomas Brandon, Assistant Director Ron Turk and SAC Wayne Dixie to enforce the DOJ/ATF Equal Opportunity Policy of a hostile free work environment.

152. On or about August 31, 2015, SAC Wayne Dixie continued his harassment and retaliation, when SAC Dixie forced S/A McLaughlin to relocate to Greensboro, North Carolina. Based on prior personnel experience as a Personnel Specialist, S/A McLaughlin verbally informed SAC Dixie that ATF did not have a policy that would require S/A McLaughlin to leave her home in order to work in Greensboro, North Carolina. This conversation occurred in the presence of ASAC Debbie Bullock and the RAC (Greensboro Field Office) on May 4, 2015. After this meeting, Assistant Director Michael Gleysteen developed and disseminated ATF policy requiring S/A McLaughlin to relocate to Greensboro, North Carolina. The policy was established on June 3, 2015, less than a month after the meeting with SAC Wayne Dixie. Prior to the policy, SAC Dixie allowed several "male" special agents under his supervision to reside outside the 50 miles zone. In fact, S/A Constance Barron stated that she was a Diversity Career Impact Coordinator (ATF Recruiter- over 15 years). S/A Barron stated that she gave ATF applicants information about rules and regulations about being a Special Agent. Most importantly, S/A Barron stated that she never gave out any paperwork that says once you become a Special Agent, you have to live 50 miles

Case 1:19-cv-00318-CCE-JEP   Document 1   Filed 03/21/19   Page 56 of 62

of your office.  Furthermore, SAC Dixie authorized another "male" special agent to reside in Raleigh, North Carolina when he was reassigned to Charlotte IV Field Office located at 6701 Carmel Road, Charlotte, North Carolina.  SAC Dixie also authorized a new position, after the "male" special agent was indicted by the U.S. Attorney's Office, Middle District of North Carolina.  Conversely, SAC Dixie forced S/A McLaughlin (**female/victim**) from her home, church and local gym facility in order to continue his retaliation, harassment and disparate treatment of female special agents in the Fayetteville Field Office.

153.  As of September 24, 2015, the Office of Professional Responsibility and Security Office (OPRSO) has refused to investigate in accordance with ATF policy, the integrity/misconduct violations reported by S/A McLaughlin against RAC Darren Hampton.  OPRSO (S/A Kyle Watson) stated that the allegations were received and reviewed, but refused to comment further regarding the status.  S/A McLaughlin received this email notification on November 30, 2015.  ASAC Debbie Bullock stated that she forwarded allegations to OPRSO.  However, RAC Darren Hampton stated that the allegations have been dismissed by the Charlotte Field Division and are without merit.  On October 7, 2015, RAC Hampton stated that "to my knowledge I am not under investigation by OPRSO".  Furthermore, ATF disseminated a broadcast announcement (October 28, 2015) which stated, "employees must report any allegations or information indicating a violation of the standards of conduct".  In addition, this responsibility is documented inside ATF training modules (Standards of Conduct, Ethics).  Conversely, SAC Wayne Dixie allowed RAC Darren Hampton to file a misconduct complaint against S/A McLaughlin in February 2015.  In

accordance with ATF policy, OPRSO opened an investigation into the complaint without excuse or delay regarding the "Misuse of GOV".

154. On or about October 27, 2015, ATF management officials continued the harassment and retaliation, when they allowed former RAC Darren Hampton to prepare the 2015 Performance Evaluation for S/A McLaughlin. Again, RAC Hampton falsely stated that S/A McLaughlin had only produced seven (7) defendants for Federal prosecution. Furthermore, the evaluation was modified three (3) times by the Charlotte Field Division. In fact, RAC Hampton wrote in the evaluation that "S/A McLaughlin was afforded the opportunity to provide comments and input for this evaluation but as of October 27, 2015 she has not responded". RAC Hampton "afforded" S/A McLaughlin the same opportunity for the 2014 Performance Evaluation. Moreover, RAC Hampton still knowingly and intentionally falsified the evaluation, as S/A McLaughlin provided RAC Hampton the statistical breakdown of her investigative activity for the rating period. In addition, S/A McLaughlin emailed the information to ASAC Debbie Bullock and ASAC Bullock still authorized the evaluation with the false information.

155. On May 16, 2016, S/A Lori McLaughlin received a five (5) suspension (Conduct Unbecoming a Special Agent) based on a bias/unfair internal affairs investigation conducted by S/A Kyle Walton. The misconduct investigation against S/A McLaughlin was initiated by former RAC Darren Hampton.

156. On May 16, 2016, S/A Lori McLaughlin received a five (5) suspension (Conduct Unbecoming a Special Agent) based on the violation of ATF policy by S/A

Eugenio Marquez (Bureau's Deciding Official) and the Professional Review Board (PRB).

157. On June 3, 2016, S/A McLaughlin reported the misconduct violations committed by RAC Darren Hampton directly to the Department of Justice, Office of the Inspector General. During the meeting, S/A McLaughlin was advised that the OIG had instructed ATF to investigate her allegations against RAC Hampton.

158. As of August 11, 2017, Deputy Director Thomas Brandon has failed to issue a final decision in accordance with ATF policy regarding an appeal for disciplinary action (3-day suspension) that was submitted by S/A Lori McLaughlin on June 12, 2014. Deputy Director Brandon failed to issue a decision, because DOJ Attorneys filed the misconduct violations in retaliation for participation in the EEO Process. Furthermore, S/A McLaughlin submitted evidence that DOJ Attorneys had committed the same violation.

159. As of August 11, 2017, S/A Eugenio Marquez (Bureau's Deciding Official) and the Professional Review Board has failed to issue a final decision in accordance with ATF policy regarding two (2) allegations for which S/A Lori McLaughlin was investigated by OPRSO. Specifically, S/A McLaughlin was also investigated for Endangering the Life of an Undercover Agent and Violating an EEO Stipulated Protective Order.

160. As of August 11, 2017, S/A Kyle Walton has failed to re-open his IA investigation in order specifically identify the other two (2) misconduct allegations that were investigated but never adjudicated in accordance with ATF policy.

Case 1:19-cv-00318-CCE-JEP    Document 1    Filed 03/21/19    Page 59 of 62

161. Because of the ongoing adverse, hostile treatment and environment in which Plaintiff McLaughlin was forced to work, Plaintiff McLaughlin requested and eventually received a transfer (PCS move) to the Greensboro Field Office of ATF.

## COUNT I – UNLAWFUL DISCRIMINATION BASED UPON RACE

162. Paragraphs 1 through 178 are herein incorporated by reference.

163. The actions detailed herein constituted unlawful discrimination based upon race (African-American) committed by the Agency, its agents and employees, against the Plaintiff.

164. Such unlawful discrimination resulted in past and future financial loss to Plaintiff, a loss to Plaintiff of professional esteem and standing, personal stress and mental pain and suffering.

## COUNT II --- UNLAWFUL DISCRIMINATION BASED UPON SEX

165. Paragraphs 1 through 178 are herein incorporated by reference.

166. The actions detailed herein constituted unlawful discrimination based upon sex (female) committed by the Agency, its agents and employees, against the Plaintiff.

167. Such unlawful discrimination resulted in past and future financial loss to Plaintiff, a loss to Plaintiff of professional esteem and standing, personal stress and mental pain and suffering.

## COUNT III -- RETALIATION OR REPRISAL FOR PROTECTED EEO ACTIVITIES

168. Paragraphs 1 through 178 are herein incorporated by reference.

169. The actions detailed herein constituted acts of unlawful retaliation for protected EEO activities against Plaintiff McLaughlin committed by the Agency, its agents and employees.

60

170. Such unlawful retaliation resulted in past and future financial loss to Plaintiff, a loss to Plaintiff of professional esteem and standing, personal stress and mental pain and suffering.

## COUNT IV -- HARASSMENT
## OR HOSTILE WORK ENVIRONMENT

171. Paragraphs 1 through 178 are herein incorporated by reference.

172. The actions detailed herein constituted acts of unlawful harassment constituting a hostile work environment for Plaintiff McLaughlin committed by the Agency, its agents and employees.

173. Such unlawful harassment resulted in past and future financial loss to Plaintiff, a loss to Plaintiff of professional esteem and standing, personal stress and mental pain and suffering.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lori McLaughlin respectfully requests that this Court enter judgment against Defendant, and grant Plaintiff McLaughlin the following relief:

a. Approval of at least three ATF and/or DOJ training courses selected by Plantiff McLaughlin for career professional development;

b. Modification and removal of all false information contained inside Plaintiff's Annual Performance Appraisal for the period ending September 30, 2014.

d. Restoration of all sick leave exhausted as a result of the emotional distress and associated EAP counseling sessions.

e. Reimbursement by ATF to Plaintiff McLaughlin for all out-of-pocket costs (including reduction in salary from locality pay) associated with her move from Fayetteville to Greensboro, North Carolina, in 2015.

61

f.  Backpay with interest for all "suspensions" and removal from official record;

g.  Payment of $300,000 in compensatory damages; and,

h.  Payment of all costs and attorneys' fees associated with the litigation of this

matter at the ATF/DOJ EEO, EEOC and United States District Court levels.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule 38(b), trial by jury on all issues presented herein is

respectfully demanded.

Respectfully submitted,

LORI D. MCLAUGHLIN
6606 Jockey Club Drive
Whitsett, North Carolina 27377    (3.20.19)
Cell:  (972) 342-0056
E-Mail:  lori.mclaughlin@atf.gov

62